AMELIA MEATH and NICK SANBORN
p/k/a SYLVAN ESSO,

                      Plaintiffs,

          v.

EVENTBRITE, INC., and TICKETFLY,
LLC,

                    Defendants.

**COMPLAINT AND DEMAND
FOR JURY TRIAL**

## <u>INTRODUCTION</u>

Plaintiffs Amelia Meath ("Meath") and Nick Sanborn ("Sanborn") together comprise the successful Grammy Award nominated musical duo known as Sylvan Esso. Sylvan Esso has sold hundreds of thousands of albums, had fans listen to its songs through streaming services more than 300 million times, and has a radio airplay audience of more than 54 million listeners. More than 170,000 people have paid to see one of Sylvan Esso's headlining live musical performances. Sylvan Esso and its music and the appearance of the band in concert are well known and clearly recognizable to music fans.

Defendant Ticketfly, LLC ("Ticketfly") provides a concert ticket purchasing service. Ticketfly is a wholly owned subsidiary of Defendant Eventbrite, Inc. ("Eventbrite"), which also offers ticket purchasing services.

Since at least May of 2016 Defendants have widely published advertisements for the services of Ticketfly that incorporate a clearly identifiable photograph of Sylvan Esso

in concert.  These advertisements have been published, among other venues, on multiple pages of the Ticketfly website, on the opening page of Ticketfly's mobile application on the iOS platform, in social media outlets, and in third party publications.  The advertisements lead consumers to believe that Sylvan Esso endorses the services of Ticketfly.  Defendants neither requested nor received permission from Plaintiffs to use the image, persona and identity of Sylvan Esso in advertising for the Defendants' services.

Plaintiffs have demanded that Defendants cease all use of their image, identity and persona in advertising, but Defendants have failed and refused to do so.  Through this Civil Action, Plaintiffs seek, among other relief, an order immediately and permanently enjoining Defendants from continuing to publish any advertisements or other materials that include the image, identity or persona of Plaintiffs and requiring Defendants to pay appropriate damages for their unauthorized use of the Plaintiffs' image, identity and persona.

## THE PARTIES

1.      Meath is a citizen and resident of Durham, Durham County, North Carolina.

2.      Sanborn is a citizen and resident of Durham, Durham County, North Carolina.

3.      Eventbrite is a corporation incorporated under the laws of Delaware with its principal offices located in San Francisco, California.

4.     Ticketfly is a limited liability company organized under the laws of Delaware with its principal offices located in San Francisco, California.  Upon information and belief, Ticketfly is a wholly owned subsidiary of Eventbrite.

## JURISDICTION AND VENUE

5.     This is a civil action seeking damages and injunctive relief for (a) false advertising and endorsement under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), (B); (b) unfair or deceptive trade practices under N.C. Gen. Stat. § 75.1.1; and (c) violation of the Plaintiff's rights of publicity and privacy under the common law of North Carolina.

6.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, § 1332 and § 1338; and 15 U.S.C. § 1121.  The amount in controversy exceeds $75,000 and the action is between citizens of different states.  The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) and § 1338.

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c).  A substantial part of the events or omissions giving rise to these claims have occurred and are occurring in this District and Defendants are subject to personal jurisdiction in this District, as further set forth below.

## FACTS

### *Sylvan Esso*

8.     Meath and Sanborn together form the musical duo known as Sylvan Esso ("Sylvan Esso" or the "Band").  Since its founding in 2013, Sylvan Esso has released two

3

full length albums, an EP, and two non-album singles to significant critical acclaim and popular success.

9.     Fans have listened to the Band's recordings through streaming services more than 317 million times, their total radio airplay audience exceeds 54 million listeners, and the Band has sold more than 300,000 albums and streaming equivalents.  The Band's most recent full-length album, *What Now*, was released in 2017 to rapturous critical acclaim and was nominated for a Grammy Award in the "Best Dance/Electronic Album" category.

10.     In addition to its acclaimed catalog of recorded music, the Band is particularly well known for its dynamic live performances.  Since its debut the Band has toured the country and overseas tirelessly as a headline performer at storied venues such as the Greek Theatre in Los Angeles, the Red Rocks Amphitheatre in Colorado, and First Avenue in Minneapolis and through performances at music festivals such as the Bonnaroo Music Festival, Lollapalooza, Coachella, the Austin City Limits Music Festival, and the Hopscotch Music Festival.  During the period from July 2016 to May 2019 fans purchased more than 170,000 tickets to the Band's headlining concert performances.

11.     Since 2016 the Band's activities, including their recordings, music videos, television performances and concerts have generated widespread and overwhelmingly positive press coverage, with more than 1000 articles published about the Band and its music in print and online media outlets such as the New York Times, the Washington Post, the Los Angeles Times, USA Today, Time, New York Magazine, Entertainment Weekly, NPR, Paste Magazine, Nylon, Stereogum, SPIN, Forbes, GQ, Esquire and many others.

4

12.     Sylvan Esso's live performances consist of vocals from Meath accompanied by electronic music generated by Sanborn from an electronic mixing console.  Sanborn's rig is typically situated to Meath's left as she faces the audience.  Meath holds a wireless microphone and sings and dances while Sanborn moves and dances in place in front of his console while he generates the music.  The Band's concerts feature a dynamic light show that surrounds the stage in colored lights.

13.     Fans and music critics alike are familiar with the iconic appearance of the Band's live sets.  Performance reviews for Sylvan Esso frequently reference the Band's appearance in concert with comments such as the following:

(a)     *But the duo's live performance is where it's at — anyone who has seen Sylvan Esso perform is immediately engrossed by their indomitable energy and raw, idiosyncratic style.  Amelia Meath's cheeky, f\*\*\*-it attitude, the bizarre dance moves that make her seem like she always has to pee, juxtaposed with Nick Sanborn's cool, relaxed demeanor, as if he's saying "I'm just along for the ride."* "Watch Sylvan Esso's Lively, Electric Concert Video for 'Signal,'" *NPR*, June 21, 2018.

(b)     *Rote vocals over processed beats can make bands with similar constructions lifeless performers.  Meath and Sanborn defy this trope with an engaging live dynamic.  Sanborn was physically present, setting up beats and twisting knobs, moving his whole body and making eye-contact with Meath throughout each song.  It wasn't just him, though, as it was nearly impossible to take your eyes off the vocalist.  She danced, strutted, and twisted her body around while emanating her nearly perfect vocals.  Together, the two have an intoxicating energy that elevates their performance into unexpected realms.* "Live Review:  Sylvan Esso at Chicago's Metro," *Consequence of Sound*, March 15, 2015.

(c)     *Meath rocked the small stage with the prowess of a pop star on a stadium tour.  Donning a black bodysuit with bold floral accents along the neck and leg holes, she let the music flow through her in seemingly unchoreographed dances, feeding off the energy of the*

5

*room. As Meath pranced and writhed around the front of the stage, her vocals never wavering at the expense of her movement, Sanborn intensely focused on his beats and bounced along with the same enthusiasm of the adoring crowd.* "Review: Sylvan Esso showed The Anthem a good time," *The Diamondback*, August 1, 2018.

(d)     *As Sylvan Esso's audience has grown, so too has their live show, which now boasts an enormous light display that any Scandinavian superstar DJ would be proud to tour behind. There were times Sunday night, as mammoth rigs flooded the Pabst Theater with brilliant light at the duo's second of two sold-out shows that weekend, where the sheer abundance of sound and color overwhelmed the venue. It felt as if they were getting away with something, squeezing a show optimized for enormous festival stages into such an intimate theater.*

*Yet as spectacular as the set production was, it never detracted from the night's central draws: Meath and Sanborn, the two down-to-earth presences behind all the glamor. They worked the crowd with hand-claps, beat drops and sing-alongs. Sanborn pumped his arms while corked over his gear, his enthusiasm a proxy for the crowd's, while Meath danced, squatted and slid around the stage like the star of her own imagined workout video. She's become a fiercer, more physical presence by the year.* "Sylvan Esso Packed an Enormous Show into the Pabst Theater," Shepherd Express, July 23, 2018.

14.     Reviews of the Band's performances are often published online and in print publications accompanied by photographs of the Band in concert. These photographs typically show Meath holding a microphone on the left side of the frame while Sanborn crouches over his console on the right side of the frame, with the image often saturated in colored light from the light show. A few representative examples of photographs from reviews of the Band's concerts are set forth below:

6







15.    The Band publicizes its music and performances through social media, online and print advertisements, and otherwise.  This publicity regularly includes publication of photographs of the Band in concert.  For example, the following image comes from a post on the Band's Instagram page:



16.    As a result of the Band's live performances, television appearances, music videos, concert reviews, other publicity surrounding the Band, and the Band's advertising and promotional efforts, the image, identity, likeness and appearance of the Band in concert (collectively, the Band's "Concert Persona") has become well known to music fans and forms a significant part of the Band's commercial and artistic goodwill and reputation. Music fans and others readily recognize the Band's Concert Persona and identify it with Plaintiffs.

17.    Due to the extensive goodwill and critical reputation achieved by Sylvan Esso, the Band's Concert Persona has considerable commercial value.  Sponsors such as AT&T, Google and others regularly offer and pay significant licensing fees to use the music, image and/or Concert Persona of the Band in advertisements and other promotional materials.

Case 1:19-cv-00546-WO-JLW   Document 1   Filed 05/28/19   Page 9 of 21

18.     The Band cultivates and controls its reputation by, among other things, carefully curating its commercial endorsements and allowing its music, Concert Persona, and other aspects of its image and identity to be used only under tightly controlled circumstances by third parties whose image and reputation is consistent with, and would not detract from, from the image and reputation of the Band.

19.     The Band is particularly careful to limit any commercial usage of its Concert Persona because the visual appearance of the Band in commercial advertisements creates a stronger and more direct consumer association between the sponsor and the Band than a license that merely permits a third party to use the Band's music.  For instance, in 2014 the Band turned down a lucrative opportunity to endorse the GAP clothing store, in large part because the proposed advertising campaign called for the Band to appear personally in an advertising video rather than merely license the use of one of its recordings.

### *Ticketfly and Eventbrite*

20.     Ticketfly provides a service that certain concert venues and event promoters use to distribute tickets for live musical performances.  People who want to attend concerts at venues that work with Ticketfly can purchase tickets from Ticketfly's website (the "Ticketfly Website") or its iOS mobile application (the "Ticketfly App").

21.     Upon information and belief, at all times pertinent to this lawsuit, Ticketfly was a party to contracts with concert venue operators and event promoters located within the Middle District of North Carolina (the "District") through which music fans based in this District could use the Ticketfly Website or the Ticketfly App to purchase tickets to

10

attend concerts located in this District. For instance, Ticketfly currently offers internet users in this District the opportunity to purchase tickets for concerts that take place at the Motorco Music Hall in Durham, North Carolina.

22. Eventbrite provides online ticketing services for event organizers. Among other things, event organizers can enter into contracts with Eventbrite through which Eventbrite distributes tickets for their events. Internet users can purchase tickets to various types of events through the Eventbrite website, including but not limited to social events, events involving food and drink, business events, and music performances and festivals. Upon information and belief, at all times pertinent to this lawsuit Eventbrite was a party to contracts with event organizers located in this District, and internet users in this District could use the Eventbrite website to purchase tickets for events in this District.

23. Upon information and belief, as of about June 9, 2017, Eventbrite acquired all outstanding equity interests in Ticketfly, which became a wholly owned subsidiary of Eventbrite. At or about the time of this acquisition, Eventbrite CEO Julia Hartz announced that the two organizations planned to work towards "integrating the platforms and creating one experience for customers, which is going to take a lot of heavy lifting." Thereafter, in November 2019 Eventbrite announced plans to phase out use of the separate Ticketfly platform and transition customers to a new platform called Eventbrite Music.

24. As of the date of this lawsuit, the Ticketfly App and the Ticketfly Website continue to operate independently of the website and mobile applications that operate under the Eventbrite brand. Upon information and belief, Defendants Ticketfly and Eventbrite

jointly operate, and share responsibility for advertising and promoting, the Ticketfly App and the Ticketfly Website.

25. Upon information and belief, Ticketfly's customer database was hacked in late May of 2018 and information regarding approximately 27 million users was stolen (the "Data Breach"). Thereafter, a class action lawsuit was filed against Eventbrite in which the plaintiffs alleged that the Eventbrite failed to prevent or detect the Data Breach and failed to implement a reasonable protocol to notify customers of the Data Breach. The Data Breach and resulting lawsuit generated widespread negative publicity and caused significant harm to the Defendants' brand and reputation.

26. More recently, in April 2019 a shareholder lawsuit was filed against Eventbrite and others alleging that Eventbrite made materially false and misleading statements and failed to disclose material facts to shareholders and prospective shareholders about, among other things, difficulties associated with the effort to transition customers from the Ticketfly platform to the Eventbrite platform. This lawsuit was also widely publicized and caused further harm to the Defendants' reputation.

### *Defendants' Unauthorized Commercial Use of*<br>*Sylvan Esso's Image and Concert Persona*

27. On or about May 28, 2016, a fan of Sylvan Esso sent the Band an email that included a copy of the following advertisement the fan had seen for Ticketfly's mobile iOS platform (the "Ad"). The Ad prominently featured a clearly recognizable photograph of the Band in concert (the "Image"):



28.     Upon information and belief, the Ad appeared on the screen of the fan's computer together with the purchase receipt after he had used the Ticketfly Website to purchase a concert ticket.

29.     The Image comes from a photograph taken of the Band while they were performing in concert, and it clearly depicts the Band's Concert Persona.  Among other things, the Image shows Sanborn crouching over his mixing console on the right side of the frame with Meath on the left side of the frame with purple/blue concert lights in a pose that would be familiar to anyone who has seen one of their live shows, videos of their live performances, or concert photographs.

30.     From at least May 2016 to the present, the Ad and other advertisements that include the Image have been widely published by or on behalf of Defendants and distributed through multiple outlets and media.  Among other things, the Defendants have

widely published the Ad or the Image, or permitted the Ad or Image to be published: on several different pages of the Ticketfly Website, on the home screen of the Ticketfly App, on purchase receipts for tickets purchased from Ticketfly, on social media pages for Ticketfly, and in online advertisements for Ticketfly. In each instance, Band's Concert Persona was clearly depicted and used by Defendants in advertisements and promotional features for the Ticketfly platform. The Ad and other advertisements have been and continue to be available to and marketed towards, among others, consumers located in the Middle District of North Carolina.

31. Defendants never sought nor received permission or authority to use the Band's Concert Persona to advertise, promote, market or endorse the Ticketfly platform or the services of Defendants.

32. Defendants neither offered nor paid any compensation to Plaintiffs for the unauthorized use of the Band's Concert Persona to advertise, promote, market, or endorse the Ticketfly Platform or the services of Defendants.

33. After the Plaintiffs became aware of Ticketfly's unauthorized use of their image and Concert Persona in advertising, Plaintiffs used informal channels in an effort to quietly request that Ticketfly cease using the Ad and Image to advertise or promote its services.

34. Thereafter, the Band became aware in September 2018 that Ticketfly was continuing to use the Ad and Image when Sanborn purchased a concert ticket through Ticketfly and received a purchase receipt that included the Ad and Image. Further

14

investigation revealed widespread unauthorized use of the Ad and Image by Defendants on the Ticketfly Website, the Ticketfly App, and elsewhere on the internet.

35.    Plaintiffs were particularly frustrated in September 2018 by the Defendants' continued unauthorized use of the Ad and Image because it created the false impression of an association between Plaintiffs and Defendants at the apex of the adverse publicity regarding the Defendants that arose from the Data Breach and its aftermath.

36.    By letter dated October 19, 2018, Plaintiffs' counsel sent a letter (the "Letter") informing Eventbrite's General Counsel Samantha Harnett that Defendants have been using the Band's image and Concert Persona to market, advertise and promote the services of Defendant  without authorization from Plaintiffs.  Plaintiffs demanded that Defendants immediately cease and desist from reproducing, distributing, displaying and otherwise exploiting the Image for commercial purposes.  The Letter was sent by certified mail and received by Eventbrite on October 22, 2018.  Eventbrite failed and refused to respond to the Letter.

37.     In a further good faith effort to resolve this issue informally, counsel for Plaintiffs reached out to Linsey Morrison, the Associate General Counsel for Eventbrite, through an email dated April 30, 2019.  A paralegal for Eventbrite acknowledged receipt of the letter and promised to investigate.  Thereafter, by email dated May 10, 2019, the paralegal requested Plaintiffs' counsel to follow Eventbrite's online procedure for requesting "take down" of infringing materials that third parties upload to Eventbrite's website.  This "take down" procedure, however, is designed to address infringing materials

15

uploaded by third parties without Eventbrite's knowledge, and is not the appropriate vehicle for addressing claims that Eventbrite or its subsidiary directly infringed upon another's rights through their own advertising.

38.     Apart from this emailed request for Plaintiffs to follow an irrelevant "take down" procedure, Defendants have failed and refused to respond to Plaintiffs' demands, and, upon information and belief, they continue to publish and display the Ad and Image to promote, advertise and market the Defendants' services without Plaintiffs' consent.

39.     Defendants' continued unauthorized publication of the Ad and Image have caused, and unless enjoined by this Court will continue to cause, irreparable injury and other harm to Plaintiffs' business and reputation and the goodwill they have developed. Among other things, Defendants' wrongful activities have caused Plaintiffs to be associated in the minds of consumers with Defendants, whose reputation and image were tarnished by, without limitation, the Data Breach and its aftermath and the Eventbrite shareholder lawsuit.

40.     There is no adequate remedy at law for the harm the Defendants' ongoing wrongful activity is causing to Plaintiffs' image and reputation.

<h3 style="text-align:center">COUNT I</h3>

<h3 style="text-align:center">FALSE ENDORSEMENT (15 U.S.C. § 1225(a)(1)(A))</h3>

41.     Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-40 of the Complaint.

42.     Defendants have published or caused the Ad and Image to be published on the Ticketfly Website, the Ticketfly App, and in several other media and outlets (the "Publication Venues") during the period from no later than May 28, 2016 to the present.

43.     Since at least May of 2016 Defendants have engaged in widespread publication and distribution of the Ad and the Image in the Publication Venues to market, advertise and promote the Defendants' services.

44.     Plaintiffs did not and do not consent to the publication or distribution of the Ad or the Image by Defendants in any form, format, or medium.

45.     The Ad and Image display the Concert Persona of the Plaintiffs in a manner that is clearly recognizable to consumers.

46.     By publishing the Concert Persona of Plaintiffs without authorization to market, advertise and promote the Defendants' services, Defendants have falsely suggested to consumers that Plaintiffs endorse, sponsor or approve of the Defendants and/or their services.  Defendants' activities constitute false and misleading representations of fact with regard to the Plaintiffs' supposed endorsement, sponsorship or approval of the Defendants and/or their services.

47.     The actions of Defendants described herein are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of Plaintiffs with Defendants, or as to the origin, sponsorship, or approval of the Defendants' services and commercial activities.

48.     Defendants' actions constitute false endorsement in violation of the Lanham Act, 15 U.S.C. §§ 1125(a)(1)(A) and (a)(1)(B).

49.     As a result of Defendants' wrongful actions described herein, Plaintiffs have suffered and are entitled to recover damages and lost profits from Plaintiffs in an amount in excess of $75,000 to be determined at trial.

<u>**COUNT II**</u>

**UNFAIR OR DECEPTIVE TRADE PRACTICES (N.C. GEN. STAT. § 75-1.1)**

50.     Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-49 of the Complaint.

51.     Defendants' unauthorized use of Plaintiffs' Concert Persona to promote, advertise and market the Defendants' services has deceived and continues to deceive consumers into believing that Plaintiffs have endorsed, sponsored or otherwise approved of Defendants or their services.  This conduct has enabled Defendants to unfairly benefit from the hard-earned reputation and goodwill of the Plaintiffs without providing any compensation or remuneration to Plaintiffs.

52.     Defendants' actions constitute unfair methods of competition and unfair or deceptive acts or practices in and affecting commerce within the meaning of N.C. Gen. Stat. § 75-1.1.

53.     The actions of Defendants set forth herein took place in or affecting commerce.

54.     The actions of Defendants set forth herein proximately caused damage and injury to Plaintiffs in an amount in excess of $75,000 to be proven at trial for which Defendants should be held liable for treble damages pursuant to N.C. Gen. Stat. § 75-16.

55.     Because Defendants willfully engaged in the practices set forth herein and they failed and refused to cease their wrongful activity upon receipt of a clear and timely demand from Plaintiffs, Defendants should be held liable for an award of attorney fees under N.C. Gen. Stat. § 75-16.1.

## COUNT III

## RIGHT OF PUBLICITY UNDER NORTH CAROLINA COMMON LAW

56.     Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-55 of the Complaint.

57.     Defendants have published multiple advertisements that use the Concert Persona of Plaintiffs.  Plaintiffs did not consent to the Defendants' promotion, marketing and advertising of their Concert Persona.

58.     Defendants' actions as set forth herein constitute violations of the Plaintiffs' right of publicity under North Carolina law.

59.     Plaintiffs have suffered harm and injury in an amount in excess of $75,000 to be proven at trial as a proximate result of the Defendants' violation of Plaintiffs' publicity rights.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court will:

1.      Enter judgement in favor of Plaintiffs and against Defendants on each of the Counts in the Complaint;

2.      Preliminarily and permanently enjoin Defendants from publishing, distributing or using the Ad, the Image, or any other manifestation of the Plaintiffs' image, likeness or identity in any advertisements for the Defendants' services in any medium, form or format, and order that any such existing publications be destroyed or removed from circulation;

3.      Order Defendants, jointly and severally, to pay Plaintiffs all damages, profits and enhanced damages to which Plaintiffs are entitled for false endorsement under the Lanham Act, 15 U.S.C. § 1117(a);

4.      Order Defendants, jointly and severally, to pay Plaintiffs three times the damages they suffered as a result of the Defendant's violations of N.C. Gen. Stat. § 75-1.1 in addition to their reasonable attorneys' fees as a result of Defendants' willful actions under N.C. Gen. Stat. §§ 75-16 and 16.1;

5.      Order Defendants, jointly and severally, to pay Plaintiffs all damages to which they are entitled as a result of their violation of Plaintiffs' right of publicity under North Carolina law;

6.      Order Defendants to pay all costs associated with this action; and.

7.      Award Plaintiffs a trial by jury of all claims so triable in this matter.

This the 28th day of May, 2019.

**POYNER SPRUILL LLP**

By:   s/ Eric P. Stevens
          Eric P. Stevens
          N.C. State Bar No. 17609
          estevens@poynerspruill.com
          P.O. Box 1801
          Raleigh, NC  27602-1801
          Telephone: 919.783.1017
          Facsimile:  919.783.1075

          *ATTORNEYS FOR PLAINTIFFS*
          *AMELIA MEATH AND NICK*
          *SANBORN P/K/A SYLVAN ESSO*